Filed 5/12/22  P. v. Washington CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>GREGORY WASHINGTON, JR.,<br><br>　　　Defendant and Appellant. | A160665<br><br>(Solano County<br>Super. Ct. No. FCR324568) |

　　　Defendant Gregory Washington, Jr. appeals a judgment entered upon a jury verdict finding him guilty of second degree murder.  He contends the trial court failed to follow the required procedures to protect one incompetent to stand trial due to intellectual disability; that he was deprived of his constitutional rights by the destruction of exculpatory evidence; and that the trial court improperly allowed an officer to testify about the contents of a surveillance video.  We shall affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.　Prosecution Evidence**

　　　A passing bicyclist found the murder victim, Mark Pyne, dead in a grassy area outside Allan Witt Park in the City of Fairfield around 4:45 on the afternoon of September 19, 2016, and he called 911.  Pyne had been

stabbed 16 times with a sharp object such as a knife on the back of his body, the front of his body, and his neck, and he died of his wounds.

The City of Fairfield has video surveillance cameras at various places in the city. A police officer reviewed cameras along West Texas Street and saw images from 4:12 the afternoon of the killing, showing a person walking into the area where Pyne's body was later found and apparently preparing something to lie down on. No one else entered the area until 4:27 p.m., when a man wearing a baggy white shirt came into the video from the same direction and went to the grassy area where the first person was lying. The man in the white shirt reached to his right side and leaned over the victim. Our review of the video shows the area where these events took place was partly obscured by trees and shadows, but the upper body of the person in the white shirt was moving as he leaned over the victim. He then promptly left the grassy area, and his right arm appeared to reach in front of him. At 4:40, a bicyclist stopped at the scene. Police officers arrived a few minutes later.

Images from a nearby video camera taken at 4:29 p.m. showed the person in a white shirt walking down the sidewalk of West Texas, then looking back in the direction where Pyne had been stabbed. His shirt did not appear to have blood stains. Video from 4:32 showed the person in a nearby shopping center that included a store called Premier Pawn. Premier Pawn had a video surveillance system, which showed the same person walking outside the store between 4:25 and 4:40 the day of the killing.

The Fairfield Police Department posted videos of the suspect on its Facebook page, and Pyne's brother watched them. A few days after the killing, Pyne's brother was at a restaurant in Vacaville, and through the windows he saw defendant walking outside and recognized him as the person in the videos. He called 911 and followed defendant until officers arrived.

2

Vacaville police officers who responded to the call found defendant and detained him. When they told him that Fairfield Police officers were on their way to speak with him, defendant began acting nervous, his feet began shaking, and he looked in all directions and said, " 'I don't know nothing.' " The officers patted down defendant's clothing and discovered a hard object in his pocket. Defendant said the object was a pair of toenail clippers, but when the object was removed, it was a fairly large pocketknife.

Defendant's father was later shown images and a video taken by Premier Pawn's surveillance cameras shortly after the killing, and he recognized defendant as the person shown in them.

A forensic search of defendant's cell phone revealed multiple Google searches, which had been deleted, for topics similar to " 'killing in Fairfield' " and links to a local newspaper's article entitled " 'Police turn to community as park homicide investigation continues,' " which discussed the killing of Pyne and included a still image and videos of the then-unidentified suspect.

## II. Defense Case

Defendant presented evidence that another person, Jamar Kaufman, might have killed Pyne. Zachary Geddes, a Fairfield police officer, made contact with Kaufman, a person of interest in the case, near the Allan Witt Park on the day of the killing. Kaufman was known to Geddes, and he matched the general description of the suspect. He appeared to have blood under his fingernails. Also, a criminal investigator for the County of Solano took photographs of a fence near the northeast corner of Allan Witt Park, shortly before the February 2020 trial. They showed an opening in the fence large enough for a person to fit through.[1]

---

[1] A different man, who did not physically match the person in the video, told the police a few days later that he had committed the murder. He was

3

No blood was found on the knife recovered from defendant's person or on shoes found in his bedroom.

## III. Verdict and Sentencing

The jury found defendant guilty of second degree murder (Pen. Code, § 187, subd. (a))[2] and found true an allegation that he personally and intentionally used a deadly weapon, a knife, causing great bodily injury and death.

The trial court sentenced defendant to 15 years to life in prison for the murder (§ 190, subd. (a)), with a one-year consecutive term for the deadly weapon enhancement (§ 12022, subd. (b)(1)), for a total sentence of 16 years to life. This timely appeal ensued.

## DISCUSSION

## I. Competence to Stand Trial

### A. Competence Proceedings

Before trial, defendant's counsel raised a doubt as to his mental competence to stand trial. The trial court suspended the proceedings and appointed Dr. Janice Nakagawa to examine defendant and prepare a report. (§ 1368.)

Dr. Nakagawa concluded defendant was incompetent to stand trial because of his limited intellectual functioning. She reported defendant said that he had been in special education classes from elementary through high school, that he had not held down a " 'legit job' " since 2006, and that he had been receiving disability benefits (SSI) because of his learning disability, with his father as his payee. Defendant was aware of the charges against him and

---

homeless and known to have mental health issues, and he also reported— falsely—that he had killed six Vallejo police officers in 1997.

[2] All undesignated statutory references are to the Penal Code.

showed "superficial understanding" of criminal proceedings, but he was unable to elaborate on concepts such as the pleas available to him or the roles and functions of courtroom officials. This, Dr. Nakagawa concluded, was due to his "low borderline intellectual functioning," and, along with "gaps in his consistently understanding these aspects of criminal proceedings," could "negatively impact his ability to assist counsel" in presenting his defense. Dr. Nakagawa emphasized that her assessment was not based on any clinical diagnosis such as depression, anxiety, or psychosis, but rather on deficits caused by his low intellectual functioning. Dr. Nakagawa opined that defendant's "deficits require[d] remediation with respect to reviewing critical and pertinent aspects of criminal proceedings" and that participating in a trial competency program addressing "various concepts related to criminal proceedings would be essential for him to be able to adequately understand proceedings and assist counsel."

Based on Dr. Nakagawa's report, on June 11, 2018 the trial court found defendant not competent within the meaning of section 1368 and referred him to "Mental Health" for a written recommendation regarding placement and treatment. The resulting report recommended that defendant receive inpatient treatment with the California Department of State Hospitals to receive competency training in a locked forensic setting. The trial court then committed defendant to the Department of State Hospitals, although it appears to have been a paper commitment.

On September 19, 2018, defendant objected that the delay in transferring him to the state hospital for treatment and competency restoration violated his constitutional due process rights. On September 27, defendant was admitted to a "Jail Based Competency Treatment Program." On October 9, 2018, the director of the program filed a certification of

5

restoration of mental competence, explaining that defendant had undergone evaluation and treatment since the date of his admission and expressing the view that he was now able to understand the nature of the criminal proceedings and assist defense counsel in a rational manner. (See § 1372.) Attached to the certificate was a report by Nathan Turner, Psy.D., of the program's staff, diagnosing defendant with an "[u]nspecified [i]ntellectual [d]isability" and recommending he be returned as competent to stand trial. The report noted that defendant said he had a learning disorder during his childhood, was enrolled in special education classes beginning in first grade, and had an individualized education plan. He could not explain why he began receiving SSI benefits. He denied having symptoms of depression, anxiety, insomnia, or hallucinations. His thought process was "linear and coherent," though "somewhat simplistic." He could respond appropriately to abstract hypothetical scenarios, and he "maintained adequate focus, as evidenced by not needing to have questions repeated and consistently providing relevant, correct responses." On an assessment test for mild cognitive impairment (MOCA-7.1), defendant scored two points below the cutoff for normal functioning. He had difficulty recalling information, although he could do so with cues to help him remember.

The program's report also reported that defendant had an "adequate factual understanding of the criminal proceedings" against him. He knew he was charged with murder and faced a possible life sentence; he understood the nature of a plea bargain; he understood what probation was; he understood that the public defender's job was " '[t]o fight for the person' " and that the prosecutor was the one who filed charges; he described the judge as " 'The boss' " who would impose sentence after a guilty verdict; he knew the jury decided whether someone was guilty; he knew he did not have to testify

6

and understood that if he did so he would be questioned by both his attorney and the district attorney; and he could accurately explain the difference between a court trial and a jury trial. Defendant knew the evidence against him could include his clothing, video footage, and testimony from "the person's brother," and he responded appropriately to hypothetical questions about the effect of favorable or unfavorable evidence and about how he would communicate with his attorney. The report concluded defendant had "an adequate factual and rational understanding of the proceedings against him" and "a sufficient present ability to consult with his lawyer in a reasonable and rational manner."

The court held a contested hearing on defendant's restoration to competence on February 25, 2019. The first defense witness was Dr. James Rokop, the chief psychologist for the Department of State Hospitals, Sexually Violent Predator Program. Dr. Rokop had conducted several tests on defendant. One of them showed defendant's intellectual abilities to be in the fifth percentile, within the range of moderate impairment. A different test placed him in the twelfth percentile and showed he had "very slow processing speed" and a hard time recalling narrative information. He had moderate deficits in his verbal reasoning, meaning the ability to understand and retain verbal information. These deficits could make it difficult to understand what was happening in a courtroom and to provide his attorney with information that could help in his defense, and he would "struggle" to assist his attorney rationally, that is, that "it would be difficult" for him to do so. Defendant scored in the normal range on a test for nonverbal intelligence, but in the moderately impaired range in a test for general reasoning ability, and he showed mild impairment on the ability to understand directions (operating at the level of an eight- to ten-year-old child).

7

Dr. Rokop opined defendant was "likely not" currently competent to stand trial. Defendant would "struggle in being able to rationally assist his attorney with his defense based on his verbal deficits and processing speed deficits," Rokop testified. But by "struggle," Rokop clarified he did not mean defendant was incapable of assisting with his defense, only that it would be difficult for him.

On cross-examination, Dr. Rokop testified that defendant's answers to his questions, although "delayed and impoverished," were "constant and appropriate." Defendant knew that he was charged with a stabbing close to a park in Fairfield, that the police did not find much evidence at the crime scene linking him to the crime, that he was identified through videos and was arrested when the victim's brother saw him, that his parents confirmed he was the person in the videos, and he brought up the subject of clothing. Defendant said he thought he had a 25 percent chance of being convicted, and later in the discussion said there was a 75 percent chance of acquittal.

Defendant's second expert witness was Dr. Nancy Hoffman. Her testing of defendant showed an overall IQ of 75, or borderline intellectual functioning. He scored in the second percentile, or the moderately impaired range, in a verbal comprehension test, indicating he had difficulty taking in information verbally, making sense of it, and making decisions based on it. The speed at which he took in information and processed it was in the fifth percentile, or the moderately impaired range, although his "working memory"—or holding information in mind while doing something with it— was in the 37th percentile, or the average range. Other subtests, such as those for verbal abstract reasoning, vocabulary skills, information, and comprehension, likewise showed results in the second or fifth percentile. A test for new learning and memory was in the tenth percentile, or the

8

borderline impaired range. These deficits would affect defendant's ability to follow and make sense of the courtroom proceedings and make rational decisions. He could not maintain his attention span for more than about an hour and a half. Dr. Hoffman described defendant as having an intellectual disability. She did not think he would be able to follow events at a trial or assist his attorney, and she was of the opinion he was currently incompetent to stand trial and that he was unlikely to regain competency.

Dr. Nathan Turner, a forensic psychologist who examined defendant at the competency treatment program, testified on behalf of the People. He interviewed defendant on October 3, 2018 after reviewing documents that included the charging documents, arrest reports, and Dr. Nakagawa's report, and administering a test designed to screen for mild cognitive impairment, in which defendant scored two points below the normal cutoff.

Dr. Turner spoke with defendant for 57 minutes. Defendant gave "content specific" answers to Dr. Turner's questions, and he occasionally elaborated on his answers. For instance, Dr. Turner asked the meaning of a plea of not guilty by reason of insanity, and defendant replied that it meant the person was insane. Asked to elaborate, defendant said that meant the person did not know what they were doing was wrong, or that they did not realize what they were doing. He was able to discuss the facts of his case, and his answers were consistent with the information in the police report. When asked what evidence there was against him, he said police had collected a white shirt and black pants from his parents' residence and there was video footage of a person who looked like him. In response to a question about what types of things he should tell his attorney, defendant said he should tell his attorney where he was and what he was doing the day of the killing. He understood that confidentiality between himself and his attorney

9

meant "[s]tuff that is kept between me and him." Defendant appeared to understand the roles of the various participants in the courtroom setting. When asked if he understood the gravity of the offense, he said he would receive a maximum life term if he lost. He responded appropriately to hypothetical questions about the effect of possible favorable or unfavorable testimony at trial. Dr. Turner found defendant's responses to be "somewhat simplistic but sufficiently detailed and logical," which led him to think defendant had "an adequate factual understanding and rational understanding and sufficient present ability to cooperate with [c]ounsel in his [d]efense." He was of the opinion that defendant was competent to stand trial and that he could assist his attorney rationally.

On cross-examination, Dr. Turner testified that defendant's responses were short and his thought process was "[s]omewhat simplistic." He thought defendant would be able to "appreciate" and comprehend what was going on during a trial, although he might not remember all of it. He acknowledged defendant had cognitive impairments but described defendant's understanding of the case as "simplistic but sufficient."

The trial court deemed defendant competent to stand trial and reinstated criminal proceedings. In so doing, it acknowledged that defendant had an IQ of only 75; explained that "the bar is low for competency"; found that although defendant might struggle to understand the proceedings, "the struggle does not make [him] unable to do it"; stated that defendant was not suffering from psychosis and was not diagnosed with a developmental disability; and noted the evidence that defendant was able to understand the nature and purpose of the criminal proceedings and what evidence would be helpful or unhelpful to his defense.

10

### B. *Analysis*

A person is incompetent to stand trial "if, as a result of a mental health disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).) If the question of a defendant's mental competence arises, the trial court must appoint appropriate experts to evaluate the defendant. (§ 1369, subds. (a)(1), (2), & (3).) If the court then finds the defendant incompetent to stand trial, criminal proceedings are suspended and the defendant must be committed for evaluation and treatment. (*People v. Rells* (2000) 22 Cal.4th 860, 865–866; *People v. Carr* (2021) 59 Cal.App.5th 1136, 1143.) If the health official designated by statute determines the defendant has regained mental competence he or she must file a certificate of restoration with the court, after which the defendant is returned to court for further proceedings on whether competence has been restored. (§ 1372, subds. (a), (c); *Medina v. Superior Court* (2021) 65 Cal.App.5th 1197, 1206–1207 (*Medina*).)

The statutory scheme provides two different paths for evaluation, commitment, and treatment of mentally incompetent defendants. When the defendant is incompetent to stand trial due to a "mental health disorder," section 1370 governs the proceedings. By contrast, section 1370.1 applies where the person is incompetent as a result of a developmental disability or is incompetent as a result of a mental health disorder and also has a developmental disability. (§ 1367, subd. (b); *Medina, supra,* 65 Cal.App.5th at p. 1204.)

A developmental disability that may result in incompetence "is different from the mental disorder that may also have that result." (*Baqleh v. Superior Court* (2002) 100 Cal.App.4th 478, 487.) For the purpose of a

11

competency determination, " 'developmental disability' means a disability that originates before an individual attains 18 years of age, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual. . . . [T]his term shall include intellectual disability, cerebral palsy, epilepsy, and autism.  This term shall also include disabling conditions found to be closely related to intellectual disability or to require treatment similar to that required for individuals with an intellectual disability."  (Welf. & Inst. Code, § 4512, subd. (a); see § 1370.1, subd. (a)(1)(H) [incorporating Welf. & Inst. Code, § 4512's definition of developmental disability].)

Where it is suspected a defendant has a developmental disability, the court must appoint the director of the regional center[3] or a designee to examine the defendant and determine whether he or she has a developmental disability as defined by section 4512 of the Welfare and Institutions Code and is eligible for its services and to recommend a suitable residential facility or state hospital.  (§ 1369, subds. (a)(3) & (4); *Inland Counties Regional Center, Inc. v. Superior Court* (2017) 10 Cal.App.5th 820, 831.)  This requirement does not exist if the suspected incompetence is based on a mental disorder as opposed to a developmental disability.  (§§ 1369, subd. (a), 1370.)  The standard for appointing the director is an objective one that is satisfied when the court becomes aware of information that objectively generates a doubt about whether the defendant is competent to stand trial due to a developmental disability.  (*People v. Castro* (2000) 78 Cal.App.4th 1402,

---

[3] Regional centers provide the services to which people with developmental disabilities are entitled under the Lanterman Developmental Disabilities Services Act.  (Welf. & Inst. Code, §§ 4500–4846; *Medina, supra,* 65 Cal.App.5th at p. 1204, fn. 1.)

1415–1418 (*Castro*), disapproved on other grounds in *People v. Leonard* (2007) 40 Cal.4th 1370, 1389, 1391 & fn. 3 (*Leonard*).)

Our high court has explained that section 1369's requirement of an evaluation by the director of the regional center serves three functions. First, it helps the trial court determine where the defendant should be confined pending the competency determination. Second, it helps the court decide where the defendant should be confined if found incompetent. (*Leonard, supra*, 40 Cal.4th at p. 1389.) Finally, and most relevant for our purposes, it "ensure[s] that a developmentally disabled defendant's competence to stand trial is assessed by those having expertise with such disability. . . . 'A valid assessment of a criminal defendant's ability to stand trial requires a[] comprehensive, individualized examination of the defendant's ability to function in a court proceeding. A reliable assessment is achieved through thorough examinations of each individual by experts experienced in development disabilities.' A regional center . . . is 'the primary agency to provide expert advice relating to the assessment, needs, and abilities of a criminal defendant with developmental disabilities.' Court-appointed psychiatrists and psychologists may not have this expertise, because their experience may pertain to mental illness rather than developmental disability." (*Id.* at pp. 1389–1390, fn. omitted.)

Failure to appoint the director of the regional center, even if erroneous, does not require reversal in the absence of prejudice, however. In *Leonard*, the trial court erroneously failed to appoint the regional director to determine the defendant's competency in the first instance, instead appointing two psychiatrists to examine him although his condition—epilepsy—fell within the statutory definition of a developmental disability. (*Leonard, supra*, 40 Cal.4th at pp. 1387–1388.) Our high court nevertheless concluded reversal

13

was unnecessary unless the error deprived the defendant of a fair trial to determine his competency. (*Id*. at p. 1388; accord, *People v. Townsel* (2016) 63 Cal.4th 25, 37 (*Townsel*).) Because the trial court's competency determination was "based on evidence from experts who were familiar with defendant's developmental disability and who considered it in evaluating his competence" and who testified about it at length, and because the experts were experienced in the field, the trial court's failure to appoint the director did not prejudice the defendant. (*Leonard*, at pp. 1390–1391.)

Defendant contends, and we agree, that the trial court erred in failing to appoint the director of the regional center to evaluate defendant for developmental disability. The procedural posture of this case is unusual in that the court initially *did* find defendant incompetent to stand trial, based on Dr. Nakagawa's assessment. Her opinion that defendant was incompetent was not related to any clinical diagnosis such as depression, anxiety, or psychosis. Rather, its unambiguous basis was defendant's limited intellectual functioning, which was manifested not only in Dr. Nakagawa's own testing and interactions with defendant but also in his participation in special education classes throughout his school years and his receipt of SSI benefits for his disability. Bearing in mind the statutory definition that includes "intellectual disability" and "disabling conditions found to be closely related to intellectual disability" (Welf. & Inst. Code, § 4512, subd. (a)(1)), we conclude the court had before it substantial evidence that defendant had a developmental disability for purposes of the statutory scheme governing incompetence, and it erred when it failed to seek the evaluation of the director of the regional center to assist in determining whether he had a developmental disability and what placement was appropriate. (See §§ 1369,

14

subd. (a)(3), 1370.1, subd. (a)(1)(B)(i); *Leonard*, *supra*, 40 Cal.4th at pp. 1389–1390.)

In his opening brief, defendant asserts not only that the court erred in failing to follow the requirements of section 1370.1, but also that this error deprived him of his federal constitutional right to a fair trial. Defendant does not develop this argument, however, and the only authority he cites actually refutes the notion that a failure to follow state statutory procedures necessarily violates the federal constitutional right to a fair trial. (See *Drope v. Missouri* (1975) 420 U.S. 162, 172 [precedent "did not hold that the procedure prescribed by [state statute] was constitutionally mandated"].)

Defendant's opening brief also does not argue prejudice from the court's failure to follow the mandate of section 1370.1, nor does it establish that defendant properly preserved in the trial court *any* challenge to the procedures employed in evaluating his competency to stand trial.[4] While we could end the matter here on forfeiture grounds, we conclude on the merits that defendant was not deprived of a fair trial on the issue of whether he was later competent to stand trial. (See *Leonard*, *supra*, 40 Cal.4th at p. 1388; *Townsel*, *supra*, 63 Cal.4th at p. 37.)

It is true, as defendant points out, that there is no indication in the record that the prosecution's expert witness, Dr. Turner, had experience working with people with developmental disabilities. Some of the thinness of the record may be a result of defendant's failure to challenge in the trial court

---

[4] Defendant does not assert that he objected in the trial court to being sent to the Jail-Based Competency Treatment Program, or that he argued during the competency hearing he had a statutory or constitutional right to be referred to the regional center. (See *People v. Low* (2010) 49 Cal.4th 372, 393, fn. 11 [due process claim forfeited where not raised at trial]; *People v. Mixon* (1990) 225 Cal.App.3d 1471, 1479 [contention that allocation of burden of proof in competency proceeding violated due process was forfeited].)

15

the foundation for Turner's testimony. But it is also true that, when he testified at the competency hearing, Turner had been licensed as a psychologist for less than two years. In any event, we know that Turner carried out a cognitive assessment on defendant, and he testified about the results of that assessment and about defendant's ability to understand the facts and proceedings, to reason logically, and to respond to abstract questions about the case. Also significant, defendant's expert witnesses interviewed and tested him independently and then testified at length about the results of their testing and the basis for their opinions that his intellectual deficits would make it difficult to assist counsel. Defendant does not challenge the qualifications or experience of either of his witnesses, and in making its ruling, the court made clear it was relying on the testimony of all three experts. It acknowledged Dr. Turner's interview of defendant had been limited and that the other experts had conducted more extensive testing, and it drew on all of the evidence they provided. The court understood defendant had an IQ of 75 and that "some of these things take longer for him," but it cited Dr. Rokop's testimony that, although defendant might struggle with assisting his counsel, "the struggle does not make [him] unable to do it." The court found defendant was able to understand the nature and purpose of the criminal proceedings, understood the factors that would be good and bad for his defense, and understood his "status and condition" in the criminal proceedings. Defendant does not challenge the sufficiency of the evidence to support these findings, nor the sufficiency of the evidence supporting the ultimate conclusion that he was competent to stand trial.

The facts of this case render it more like *Leonard* than like *Castro*, a case *Leonard* distinguished. (See *Leonard*, *supra*, 40 Cal.4th at p. 1390

16

[discussing *Castro*, *supra*, 78 Cal.App.4th 1402].)  In *Castro*, the two psychiatrists who evaluated competence "made no 'attempt to determine [the defendant's] intelligence level or assess the extent of her developmental disability.' " (*Leonard*, at p. 1390.)  Without any such information, the court found defendant competent, only to learn in later court proceedings that she had an IQ of 61.  (*Id*. at p. 1388.)  Here, by contrast, all three expert witnesses addressed defendant's intelligence level at the competency hearing, and the court had qualitative and quantitative data assessing defendant's intelligence.  Acknowledging the varying experience levels among the three experts, we conclude on the basis of all the evidence before the trial court that, as in *Leonard*, "the trial court's competency determination was based on evidence from experts who were familiar with defendant's developmental disability and who considered it in evaluating his competence." (*Id*. at p. 1390.)

In short, we find the trial court's error in this case to be harmless. Even without the participation of the director of the regional center, defendant received a fair trial on whether he was then able to understand the nature of the proceedings and assist defense counsel in a rational manner. We do not condone the trial court's error in failing to refer the case to the regional center, nor do we intend to suggest that compliance with section 1370.1 is optional, but under the circumstances of this case we conclude defendant's challenge must fail.

## II.   Exculpatory Evidence

### A. Background

Before trial, defendant moved to compel discovery of body camera footage from any officer who contacted Kaufman the night of the homicide and any recording from the investigation room in which Kaufman was placed

that evening. He also moved for dismissal of the case under *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*), *California v. Trombetta* (1984) 467 U.S. 479 (*Trombetta*), and *Arizona v. Youngblood* (1988) 488 U.S. 51 (*Youngblood*) on the ground the police failed to preserve exculpatory evidence.

The trial court held an evidentiary hearing on the motions. Sergeant Joshua Kresha of the Fairfield Police Department testified that he was dispatched to West Texas Street, where another officer, Zachary Geddes, had detained someone who might match the description of the suspect in the murder. The person detained, later identified as Kaufman, appeared to have blood on his hands. Kresha did not remember Kaufman's build, hairstyle, or clothing. Kaufman was transported to the Police Department's investigations building.

Kresha testified that he believed his body camera was activated during his interaction with Kaufman. It was his standard practice to have his body camera on and to download the recording onto a server at the end of the day. The system the department used at the time was the VIEVU system. Kresha described the system, which the department no longer used at the time of the hearing, as "earlier generation body-worn cameras, not advanced like what we have now." The department stopped using VIEVU because "you would miss videos, download them and nothing would be there. Or the system, even though you activate it, you can't tell if it's actually recording. . . . You're just trusting a green light saying that it's on." He knew of incidents when an officer would turn on the VIEVU body camera but it failed to record an encounter. Kresha testified that in response to the request for video from the date of the killing, he made sure that all the video he had downloaded was put on a disk for discovery.

18

Sergeant Brett Morris, who supervised the investigation, saw Kaufman in the investigations building. Based on Kaufman's manner of walking, Morris concluded he was not the suspect in the surveillance video; he explained that the person in the video had a "distinctive" or "different gait." The difference between that person and Kaufman was "night and day, in essence." Morris noticed dried blood stains on Kaufman's hands and he told another employee, Amber Blanc, to collect samples, which were booked into evidence.[5] He did not write a police report regarding his contact with Kaufman, mistakenly assuming Blanc would do so. He did not know if Kaufman was interviewed. He did not recall what Kaufman was wearing. Kaufman was released from custody.

Deputy Zachary Geddes testified that on the night of the killing he was asked to assist in the investigation. While he was on West Texas Street about a block from the park, he saw Kaufman, who fit the general description of the suspect and with whom Geddes was familiar from prior interactions. He did not recall what Kaufman was wearing. Geddes detained Kaufman, took him to the Fairfield Police Department investigations building, and placed him in one of the interview rooms. He later released Kaufman.

Geddes testified that, at the time, he wore a body camera, that he would likely have activated it when he spoke with Kaufman, and that it was his practice to download it onto a server or compact disk and book it into evidence at the end of every shift. He did not recall being asked to locate a body camera recording from the incident.

---

[5] It appears the blood samples were not tested. Defense counsel acknowledged at the hearing that the samples were in evidence and he could have them tested if he wished to do so.

19

Officer David Neal, who worked on the investigation, testified he tried to locate any audio or video that might exist of an interview with Kaufman that evening and did not find any. Neither he nor other detectives who worked with him on the investigation recalled interviewing Kaufman the evening of the killing. He would expect that at least an audio recording would exist if someone had spoken with Kaufman in the interview room, because it was his understanding that the recording system captured sounds continuously without being manually activated.

The trial court denied the motions. On the motion to compel discovery, the court explained that there was no evidence anyone interviewed Kaufman and there were no body camera recordings available, saying recordings "may or may not have been taken. It sounds not. But maybe." And, the court said, it "would be one thing if [defendant were] already in custody and [investigators] were saying, 'Well, we are focusing on this one guy [who's] not [Kaufman].' " But it spoke "volumes" to the court that, even before officers found defendant, they immediately concluded Kaufman did not match the suspect in the video. As to the motion to dismiss based on failure to retain exculpatory evidence, the court concluded there was no due process violation. It appeared no body camera recordings had been saved, there was no evidence of an interview with Kaufman, and defendant would still be able to argue from the evidence that the officers arrested the wrong person.

### B. Analysis

Defendant argues he was deprived of his constitutional rights to due process and a fair trial by the prosecution's failure to preserve what he characterizes as exculpatory evidence, the body camera recordings of officers' interactions with Kaufman. These recordings, he contends, would have allowed him to show the jury video of someone other than himself "who fit the

20

description of the suspect, with blood literally on his hands," and would have allowed the jury to compare it to the surveillance images that led to him being picked up for the crime.

The three cases we have mentioned, *Brady*, *Trombetta*, and *Youngblood*, explain and interpret the prosecution's duty to disclose and retain evidence.  (*People v. Alvarez* (2014) 229 Cal.App.4th 761, 771 (*Alvarez*).)  *Brady* requires exculpatory evidence to be disclosed "if it is material, that is, if there is a reasonable probability the evidence might have altered the outcome of the trial," regardless of the good or bad faith of the prosecution.  (*Alvarez*, at p. 771; *Brady, supra*, 373 U.S. at p. 87.)

*Trombetta* concerns the duty to *retain* potentially exculpatory evidence. This duty is limited to "evidence that might be expected to play a significant role in the suspect's defense.  To meet this standard of constitutional materiality, [citation], evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."  (*Trombetta, supra*, 467 U.S. at pp. 488–489, fn. omitted; accord, *People v. DePriest* (2007) 42 Cal.4th 1, 41–42.)  In *Trombetta*, the high court found breath test results admissible in a driving under the influence case although the samples had not been properly preserved because the officers were acting in good faith and consistent with the usual procedure, the chances the samples would have been exculpatory were low, and the defendants had other means to prove their innocence. (*Trombetta*, at pp. 488–490.)

In *Youngblood*, the police failed to preserve properly fluid samples from the clothing and body of a sexual assault victim after limited testing was carried out, which made more rigorous testing impossible later.  (*Youngblood*,

*supra*, 488 U.S. at pp. 53–54.) The high court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially* useful evidence does not constitute a denial of due process of law." (*Id*. at p. 58, italics added.) The requirement of a showing of bad faith where evidence is only potentially useful—as when "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant"—"both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." (*Id*. at pp. 57–58; see also *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8; *People v. Giddens* (2021) 72 Cal.App.5th 145, 155.)

We review the trial court's decision on a *Trombetta*/*Youngblood* motion for substantial evidence. (*People v. Montes* (2014) 58 Cal.4th 809, 837.) In our inquiry we first ask whether the destroyed evidence met either the " 'exculpatory value that was apparent' " standard or the " 'potentially useful' " standard of *Trombetta* or *Youngblood*, respectively. (*Alvarez*, *supra*, 229 Cal.App.4th at p. 774, citing *Youngblood, supra*, 488 U.S. at p. 58 and *Trombetta, supra*, 467 U.S. at pp. 488–489.) And second, "if the evidence qualified as 'potentially useful' under *Youngblood* but did not meet the *Trombetta* standard, was the failure to retain it in bad faith?" (*Alvarez*, at p. 774, citing *Youngblood*, at p. 58.)

Defendant cannot prevail under these standards. First, although Kresha and Geddes testified it was their usual practice to activate their body cameras, the record does not show affirmatively that recordings of any interactions with Kaufman ever existed, and Kresha's testimony that the

VIEVU system the police department was using at the time was unreliable supports an inference that recordings might not have been created.

Even assuming recordings of the officers' interactions with Kaufman once existed but were not preserved, defendant cannot satisfy the standards of *Trombetta* and *Youngblood*. To meet *Trombetta's* standard of materiality, the evidence must both possess exculpatory value that was apparent before it was destroyed and "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*Trombetta, supra*, 467 U.S. at pp. 488–489.) As the trial court noted, officers concluded Kaufman was not the person in the surveillance video on the day of the killing, several days before defendant was identified as a possible suspect. There is thus no reason to think the body camera video had exculpatory value that was apparent before the (unspecified) time the videos somehow disappeared from the police department's system. (See *Trombetta*, at pp. 488–489.) We also question whether defendant would be unable to obtain similar evidence that Kaufman, rather than he, was the person leaning over the victim in the surveillance video. He makes much of the fact that Kaufman had "blood literally on his hands," but the police preserved a sample of that blood; defendant remained free to test it but for reasons of his own chose not to do so.

At most, as in *Youngblood*, the videos were only "potentially useful," depending on the results of further examination, and failure to preserve them is a denial of a fair trial only if defendant can establish bad faith. (See *Youngblood, supra*, 488 U.S. at p. 58.) Although defendant did not argue below that police officers destroyed videos in bad faith, he now suggests this bad faith is implicit in the fact that other investigating officers used and successfully downloaded their body camera footage using the same VIEVU

23

system. We are unpersuaded. The evidence before the court at the hearing on the *Trombetta*/*Youngblood* motion was that the VIEVU system was unreliable, not that it never worked. As the trial court indicated, the fact that the officers released Kaufman *before* they identified defendant as a suspect suggests they were sincere in their belief Kaufman was not the person in the surveillance video. And they took samples of what appeared to be blood on Kaufman's hands and preserved them, further weakening any suggestion they acted in bad faith in failing to preserve evidence that might incriminate Kaufman.

We thus conclude the trial court properly denied defendant's *Trombetta*/*Youngblood* motion.

## C. Testimony About Surveillance Video

At trial, Officer Jimmie Williams of the Fairfield Police Department testified about what he saw as he viewed one of the surveillance videos in which, he explained, the victim came from the lower left corner of the video. The prosecutor asked what the victim was doing at one point in the video, and Williams said, "I believe it looked like he was preparing something that he laid on." Defendant objected on the ground of speculation, and the trial court overruled the objection.

Defendant contends that this statement was improper opinion testimony, that it was speculative, and that it prejudiced him. He argues the video was too murky to support Williams's interpretation of what Pyne was doing, that the video did not capture a large part of the grassy area on which Pyne was found, and that Williams's testimony created an "unfair inference as to what the man in the white shirt was doing in relation to Mr. Pyne." And, he notes, the prosecutor relied on this testimony in his closing argument by saying Pyne walked up the street and lay down for a nap. Admission of

24

this evidence, defendant contends, violates the rules that expert opinion testimony is inadmissible "if it consists of inferences and conclusions which can be drawn as easily and intelligently by the trier of fact as by the witness" (*People v. Torres* (1995) 33 Cal.App.4th 37, 45) and that "[n]o witness may give testimony based on conjecture or speculation" because it "has no tendency in reason to resolve questions in dispute" (*People v. Chatman* (2006) 38 Cal.4th 344, 382).

We are not persuaded that these unexceptionable principles render Williams's testimony inadmissible. The court in *People v. Son* (2020) 56 Cal.App.5th 689, 696–698 (*Son*), considered a challenge to a detective's testimony about what she observed on a surveillance video, including details she noticed only after watching it repeatedly, which was admitted after defense counsel argued it was too ambiguous for the witness to testify to what she saw. (*Id.* at p. 696.) The reviewing court upheld admission of the testimony against a challenge that it was inadmissible lay opinion testimony, explaining, "While it is true, as defendant argues, that the jury could have watched the video repeatedly and picked those details up on their own, the standard is not whether the testimony is essential," but whether it is "helpful." (*Id.* at p. 697.) Because the detective's testimony "speed[ed] up the [jury's] process of teasing out obscure details in the video," it met this standard. (*Ibid.*) The same can be said about Williams's testimony about what he saw in the video.

Defendant seeks to distinguish *Son* on the ground the video there was ambiguous and the one here is not clear enough to show what Pyne was doing when he was in the shadows of the grassy area. We have reviewed the video and agree it is not clear, although Williams provided a plausible interpretation of Pyne's actions. But Williams's own testimony that he

25

"believe[d] it looked like" Pyne was preparing something to lie down on implicitly acknowledged the lack of clarity in the video, and there is no reason to think the jury gave it improper weight.

In any case, we only reverse for evidentiary error if the error was prejudicial (*Son, supra,* 56 Cal.App.5th at p. 698), and we see no possibility, under any standard, that Williams's brief statement about what Pyne might be doing as he entered the grassy area affected the verdict. There is no dispute that the video showed Pyne in the approximate area where his body was later found. The only question was whether he was killed by defendant or by some unknown person. Whether Pyne prepared something to lie down upon when he reached the grassy area is of little or no moment to this inquiry. Nothing suggests the jury would have been left in doubt as to whether defendant was the killer if it had not heard Williams's testimony that the video seemed to show Pyne putting down something on which to lie.

## DISPOSITION

The judgment is affirmed.

TUCHER, P.J.

WE CONCUR:

PETROU, J.
RODRÍGUEZ, J.

*People v. Washington* (A160665)

26